# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 03-1408

**STATE OF LOUISIANA, IN THE INTEREST OF D.B.**

**VERSUS**

**M. O. AND L.O.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**APPEAL FROM THE**
**FOURTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF CALCASIEU, JUV. # 16368**
**HONORABLE GUY BRADBERRY, PRESIDING**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**AFFIRMED**.

Stephen Berniard, Jr.
Raggio, Cappel, Chozen & Berniard
1011 Lakeshore Drive, Suite 500
Lake Charles, Louisiana 70601
(337) 436-9481
COUNSEL FOR APPELLEE:
    State of Louisiana, Department of Social Services

Jamie Bice
Bice & Palermo
723 Kirby Street
P.O. Box 2125
Lake Charles, Louisiana 70602
(337) 310-1600
COUNSEL FOR APPELLEE:
    D.B., a minor

Henry Liles

Liles and Redd
940 Ryan Street
Lake Charles, Louisiana 70601
(337) 433-8529
COUNSEL FOR APPELLANT/INTERVENORS:
      M.O. and L.O.

**COOKS, Judge.**

STATEMENT OF THE CASE

M.O. and L.O. appeal the decision of the juvenile court placing the minor child, D.B., age five, in the home of his great-aunt, V. V. and her husband C.V. who reside in Port Arthur, Texas. M.O. and L.O. wish to adopt D.B. and became involved in the judicial determination of D.B.'s placement by petition of intervention.

On June 27, 2001, the State of Louisiana, Department of Social Services, Office of Community Services (OCS) filed a petition to have D.B. removed from the custody of his biological mother and adjudicated a child in need of care. The minor child, age three at the time, was found with cigarette burns on his arm and fingertips. On August 17, 2001 following a hearing, D.B. was adjudicated a child in need of care and was placed in the certified foster home of S.F. in Welch, Louisiana. At the same time, OCS began to search for permanent placement with a relative of the child. A study was conducted to evaluate the home of C.V. , stepmother of D.B.'s father. She could not take D.B. because of the presence of children and grandchildren already residing in the home. Another study was conducted to evaluate the home of D.B.'s maternal grandparents. Their home was not suitable because of past and pending criminal charges against D.B.'s maternal grandfather.

As early as August 17, 2001, an OCS report indicates the department was in the process of conducting a study on the home of D.B.'s paternal great-aunt, V. V., in Port Arthur, Texas. The V.V., and her husband, C.V., were identified by D.B.'s father as relatives who may be willing to care for D.B. On December 4, 2001, OCS requested the State of Texas conduct a study on home of V.V. pursuant to the provisions of the Interstate Compact for the Protection of Children.

On February 28, 2002, OCS received a favorable written report from its counterpart agency in Texas regarding V. V.'s home. Pursuant to that favorable report, D.B. was placed in V.V.'s home on May 10, 2002, after two trial weekend

visits. Currently, D.B. is residing with V.V. and C.V. with legal custody remaining in OCS. When D.B.'s parents failed to work on a case plan for D.B., OCS changed the case plan for D.B. from reunification to adoption. On November 15, 2002, a judgment was entered terminating all parental rights and certifying D.B. for adoption.

It was from August 17, 2001 to May 10, 2002, while D.B. was in the certified foster care of S.F., that M.O. and L.O. became involved in D.B.'s life. The foster mother, S.F., found D.B. difficult and disruptive and requested funds from OCS to place D.B. in daycare. During this time, M.O. and L.O., friends of the foster parents began to help the couple by babysitting for D.B. on a regular basis, on weekends and on holidays. M.O. and L.O. became attached to D.B. and on June 11, 2002, M.O and L.O. intervened in the juvenile proceeding seeking placement of D.B. in their home and seeking to adopt D.B.

A disposition hearing was held on February 6, 2003. An attorney was appointed to represent the interests of the minor child. OCS recommended that D.B. remain in V.V.'s home with adoption by V.V. and C.V. being the permanent goal. Following a two-day hearing, the juvenile court continued placement of the child in the V. home. However, the court found the case plan proposed by OCS inappropriate and ordered OCS to revise the plan to include the following: (1) a medical report to validate and explain D.B.'s medication provided in the diagnosis of A.D.H.D.; (2) the effect of the current sleeping arrangements in the V. home and plans for future sleeping arrangements; (3) an assessment of the language barrier; (4) the effects of a bilingual home on D.B.'s speech impediment; (4) a follow-up with Dr. Menou and a report from her to be submitted to the court five days prior to a hearing; (5) a family therapy plan to address future functioning of the family to address the specific needs of D.B.; (6) updated background checks. The juvenile court judge allowed monthly visitation by the M.O. and L.O. to continue pending another disposition hearing.

4

A second hearing was held on March 28, 2003. At the conclusion, the juvenile court was satisfied that OCS had adequately addressed all issues. The juvenile court approved the case plan allowing continued physical custody with V.V., with the eventual goal of adoption. The M.O. and L.O. filed this appeal asserting the following assignments of error:

(1) The trial court erred in allowing C.A. , daughter of V.V., to testify despite the fact that she violated a sequestration order;

(2) The trial court abused its discretion in approving placement of D.B. in the home of a distant relative and approving the relative for adoption.;

(3) The trial court erred in failing to give proper weight to the position of D.B.'s attorney and to the wishes and desires of D.B.'s parents or foster parents.

For the reasons assigned below, we affirm the decision of the juvenile court.

LAW AND DISCUSSION

*Testimony of C. A.*

M.O. and L.O. contend the juvenile court improperly allowed the testimony of C.A., daughter of V.V. Prior to testifying, C.A. admitted to discussing with her mother and stepfather the substance of their testimony. However, the juvenile court judge noted, the testimony by the V.V. and her husband, C.V., provided very little in the way of substantive evidence since neither parent spoke or understood much English. The juvenile court found justice would be better served by allowing the testimony of C.A. regarding her role in D.B.'s care and the day-to-day living conditions within the home. We find no error in this decision. It is within the juvenile court's discretion to allow a witness to testify even if the sequestration order is violated. *State v. Kimble*, 407 So.2d 693 (La.1981); *State v. Wilson*, 520 So.2d 935 (La.App. 3 Cir. 1987).

*OCS Case Plan for D.B.*

Under the statutory scheme of the Louisiana Children's Code, when a court

assigns custody of a child to OCS, OCS "shall have sole authority over the placements within its resources and sole authority over the allocation of other available resources within the department for children judicially committed to it's custody." La.Ch.Code art. 672(A). This article has been interpreted to mean once custody of a child is placed with OCS, if the court finds the child is not being properly cared for it may remove the child from the custody of OCS. However, the court is without power to designate a particular treatment plan or placement. *State in the Interest of L.C.B.*, 01-2441 (La. 1/15/02), 805 So.2d 159. Once the department has obtained custody, statutory provisions require OCS to formulate a case plan for the child which shall be reviewed by the court at a case review hearing. La.Ch.C. arts. 673 and 677. At the case review hearing, the court may approve the plan or find that the case plan is not appropriate and order OCS to revise the case plan accordingly. La.Ch.C. art. 700; *State in the Interest of L.C.B.,* 01-2441 (La. 1/15/02), 805 So.2d 159. In *State in the Interest of L.C.B.,* the court stated:

> Under the statutory scheme in place for children adjudicated in need of care and placed in the custody of OCS, the court retains the ultimate authority over a child's placement and may approve or reject a case plan submitted by the Department, but it may not revise the plan or make any particular placements itself.

*Id.* at 165.

Under La.Ch.C. art 702, the court shall conduct a hearing to "determine the permanent plan for the child that is most appropriate and in the best interest of the child. . . ." An appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. The juvenile court is in the unique position to hear the witnesses at trial and assess their credibility. *State in the Interest of S.M.W.*, 00-3277 (La. 2/21/2001), 781 So.2d 1223. We have reviewed the record and we find there is ample evidence to support the finding of the juvenile court that D.B. will be provided a safe, nurturing environment in the home

6

of his great-aunt, V.V. We find no error in the decision of the juvenile court affirming the OCS case plan for D.B.

The Louisiana Children's Code requires the state to look first for the home of a relative in which to place a child taken from his biological parents. Louisiana Children's Code Article 622 provides, in relevant part:

> A. Unless the best interest of the child requires a different placement, a child who is determined to be abused, neglected, or harmed and whose parents have failed to protect, or who is taken into custody as a child in need of care shall be placed, pending a continued custody hearing, in accordance with this priority:
>
> (1) In the home of a relative who is of the age of majority and with whom the child has been living in a wholesome and stable environment and who is willing and able to continue to offer such environment for the child pending an adjudication hearing.
>
> (2) In the home of a relative who is of the age of majority and who is willing and able to offer a wholesome and stable environment for the child pending an adjudication hearing.
>
> (3) In foster care under the supervision of the department until further orders of the court.
>
> (4) The following, among other relatives, are those who may be considered and to whom care of the child may be entrusted and are listed in the order of priority:
>
> (a) Grandparent.
> (b) Aunt or uncle.
> (c) Sibling.
> (d) Cousin.

The record indicates OCS attempted to place D.B. either in the home of his maternal grandparents or in the home of his father's stepmother. Unfortunately, neither home was satisfactory. As early as August 2001, V.V.'s home in Port Arthur, Texas was identified by D.B.'s father as a possible placement for D.B. Placing D.B. in the foster home of a non-relative was neither the first, nor best, choice for D.B., who had been shuffled from one person to another. However, in the interim, before a home study could be conducted on V.V.'s home in Texas, placing D.B. in foster care

7

was the only choice. His foster home care was not consistent. The record indicates even while D.B. was in the foster home of S.F., his care was overseen by someone other than S.F. He was sent to M.O. and L.O. on a regular basis often spending weekends and holidays in their home. He began to call them "Mommy L." and "Daddy M.." This inconsistency in caregivers is naturally confusing for a child of four. While we do not doubt the sincerity of M.O. and L.O., their willingness to provide a good home, or their attachment to D.B., we find the record supports the case plan proposed by OCS to place D.B. with his relatives in Port Arthur, Texas. M. O. and L.O. allege D.B.'s father is unknown or that V.V. is not actually related to D.B. The record does not support these allegations. D.B.'s father acknowledged paternity and, early on, identified V.V. and C.V. as family members who may be willing to care for D.B.

The initial home study conducted by the Texas Department of Protective and Regulatory Services dated February 28, 2002 was favorable. Living in the V. home are V.V., age 46, born in Honduras, and her husband of ten years, C.V., age 46, born in Cuba. C.V. does not have biological children of his own but helped V.V. raise her three children since 1991. Mrs. V.V.'s son, B.A., age 28, is married, has two children, and resides in Port Arthur near his mother. The two grandchildren visit the V. home often. C. A., age 21, resides with her mother and stepfather. She works and is a part-time student at Lamar University in Port Arthur majoring in nursing. Her sister, E. A., age 26, is employed at a local restaurant and lives with her mother and stepfather. V.V. and C.V., E.A. and C.A. live in a clean, well-kept, adequately furnished three bedroom home in a quiet, family-friendly neighborhood. The couple owns their home. All family members are U.S. residents and hold green cards. These cards ensure permanent residency as long as certain crimes are not committed. The report concludes:

8

C. and V.V. appear to have a genuine desire to care for their great nephew. The couple's adult children, E. and C. state that they are excited at the idea of having a child living in the home on a permanent basis. The family appears to be extremely family-oriented and wish to include D. in their home. Mr. and Mrs. V. do not speak English very well, but are continually learning. E. and C. speak English fluently and would be able to bridge the communication gap as needed.

D.B. was placed in the V. home in May 2002. Four months later, an evaluation of D.B. and V.V.'s home was conducted by Dr. Ann Pittman Menou, Ph.D., a licensed psychologist, at the request of OCS. At that point, V.V. expressed significant behavioral problems with D.B. at school and at home. He was noted to have poor eating habits and episodes where he "bites, bangs his head, and destroys things in the home. The family noted that they were unable to attend church with D. due to his overly active behavior and tendency to tantrum when corrected." Dr. Menou concluded:

> In summary, the family appears to be adequately attached to D. despite the behavioral challenges he has presented since his placement with them. Given his history and their description of him being overly affectionate toward unfamiliar others, I suspect he may have experienced some delays in his ability to bond quickly and appropriately to his caregivers. However, such delays would be likely to occur in any placement given the numerous disruptions in his early life.

> Of greatest concern for the family appears to be D.'s behavior, which has proven difficult for them to consistently manage. During the family session, D. did appear to exhibit symptoms of Attention-deficit Hyperactivity Disorder, including a poor attention span and a high level of distractibility. In addition, behavioral descriptions indicate that he tends to be impulsive and overly active both at home and at school. Addressing these behaviors with appropriate intervention would appear to be critical to ensuring that this placement is successful for D.

A second follow-up report from Dr. Menou, dated March 17, 2003, after D.B. had been in V.V.'s home ten months, indicates improvement in D.B.'s behavior in school and at home. D.B. had been placed on medication for his impulsive, destructive behavior and inattentiveness. Mrs. V. noted his appetite had improved and he enjoys reading. The report states:

With the family, D. was observed to be active and inquisitive but he readily responded to redirections and limits posed to him by his cousin and great-aunt. . . . Based on this follow-up session, I would suggest continued medical follow-up for D. especially as he begins school again in the fall. While his current medication appears to be adequately managing his behavioral difficulties and has led to improvements in his functioning at home and at school, he does appear to continue to have some difficulties with sustained task attention which will need on-going monitoring.

M.O. and L.O. are concerned V.V. and C.V. speak Spanish in the home and speak and read very little English. M.O. and L.O. contend this fact is detrimental to D.B. because of his speech impediment. The juvenile court ordered a follow-up report regarding this issue . Debbie Ott, from OCS, testified regarding her discussions with D.B.'s pre-K teacher and speech therapist. A written report from D.B.'s teacher, Desiree Washington, dated March 21, 2003, and the Head-Start speech evaluations appear in the record. Ms. Ott reported D.B. has a "mild articulation problem" not uncommon for a child his age. Otherwise, he was a model student and was progressing in his speech development. She reported D.B. has an ear for language and she felt being placed in a bilingual home was a "real advantage" for him.

D.B.'s pre-K teacher, Ms. Washington, reported marked improvement in D.B.'s behavior at school. When he started pre-K, he was "very disruptive and very self destructive. He ran around the room, went under tables, ran into the closets, and ran away from the teachers when in line. He would hit the children with his fist very hard. Dustin would slap the other children, and bite others to get their toy. . . .As time went by, we were consistent with him, by having him miss playtime and by holding his hand every time we left the room. We now see a behavior change." The report continues:

Since he has been with Mrs. V.V., I have seen a big change in his behavior. He no longer bangs his head when he is upset. He no longer runs from the teachers, or shows violent tendencies toward the other children. He has adjusted very well to school with the help and support of Mrs. V. . . . I contribute [sic] this to Mrs. V.'s being consistent in

10

keeping all parent teacher conferences, and following through with the discipline plan set between guardian and teacher. Mrs. V. also kept all appointments to the psychiatrist and makes sure he receives his medication daily.

When D.B. was placed in the V. home, he slept with his cousin C.A. in her room. The juvenile court ordered a study of this issue. Since that time, V.V. and C.V. have given D.B. a room of his own. V.V. and C.V. converted a laundry/storage room into a bedroom and now every family member, including D.B., has a separate bedroom. The juvenile court ordered an updated background check on C.V. The report indicated a citation in 1988 for driving without liability insurance on his vehicle and a moving traffic violation in 1989. No other criminal convictions were found. The juvenile court reviewed the testimony of all parties, including M.O. and L.O., and found the best interest of the child would be served by placing him in V.V.'s home. The home provides him with a clean, family-oriented, stable environment where his needs are met by his great-aunt and his adult cousins. D.B. has contact with Mrs.V.'s grandchildren, his cousins, on a daily basis and he is able to play outdoors with neighborhood children his own age. The pre-school he attends provides him with special services, including speech therapy, and Mrs.V. is attending to his medical needs with the help of a psychiatrist.

M.O. and L.O. contend the trial court erred in failing to give proper weight to the position of the attorney appointed to represent the interest of the child and failed to give any consideration to the wishes of the biological parents or the foster parents. The record indicates neither the biological parents nor the foster parents testified at the trial. The attorney appointed to represent D.B. did not object to the placement of the child with V.V. and C.V. The trial court considered the testimony of M.O. and L.O. and found the child's best interest would be served by affirming the case plan proposed by OCS. We find no merit in this assignment of error.

11

**DECREE**

Based on our review of the testimony and documentary evidence, we find no manifest error in the decision of the juvenile court accepting the recommendation of OCS placing D.B. in the home of his great-aunt and her family with the goal of adoption. Accordingly, we affirm the decision of the juvenile court. All costs of this appeal are assessed to M.O. and L.O..

**AFFIRMED.**